ACOSTA & RODAS, INC. y OTROS, demandantes y recurridos, *v.* PUERTO RICAN–AMERICAN INS. CO., demandada y demandante contra tercero recurrida; BANCO CRÉDITO Y AHORRO PONCEÑO, demandante y recurrente, v. JOSÉ A. RODAS y OTROS, demandados y recurridos.

*Números:* R-79-454, R-79-455    *Resueltos:* 8 de abril de 1982

584

*Edelmiro Salas García*, abogado de los demandantes recurridos; *José Enrique Otero*, de *Miranda Cárdenas, Otero, De Corral & Rodríguez*, abogados de la demandada recurrente; *Roberto Boneta*, de *Francis, Doval, Muñoz, Acevedo, Otero & Trías*, abogado de los terceros demandados recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

Conforme la constancia en autos y determinaciones de hecho formuladas por la ilustrada sala sentenciadora —con apoyo en la prueba testifical y documental desfilada— este recurso se origina propiamente el 23 de abril de 1964, fecha en que el Banco Crédito y Ahorro Ponceño concedió financiamiento interino a Acosta & Rodas, Inc. para la construcción y desarrollo del Residencial Extensión El Rosario en *Yauco*, Puerto Rico, consistente en 73 unidades de viviendas residenciales. El crédito aprobado ascendió a la cantidad de $200,000.

El Banco solicitó y obtuvo de Acosta & Rodas, Inc. dos fianzas con la Puerto Rican-American Insurance Co. (PRAICO), una de cumplimiento y otra de pago (*Payment-Performance Bond*), cada una por la suma de $50,000 a favor del Banco en garantía de la fiel observancia de las obligaciones en la culminación del proyecto.

Mientras se desarrollaba y adelantaba normalmente la construcción en Yauco —se habían superado sus etapas iniciales y se había completado un número sustancial de las unidades proyectadas— la firma de Carlos Armstrong e Hijos Sucesores, Inc. radicó el 1ro de noviembre de 1965 una demanda contra PRAICO para el cobro de una

acreencia que Acosta & Rodas, Inc. tenía con dicho suplidor. La deuda era por concepto de materiales suplidos y vendidos para un proyecto en *Guánica*, igualmente residencial, que separadamente Acosta & Rodas, Inc. había desarrollado y construido para la South Puerto Rico Sugar Corporation y también había sido financiado satisfactoriamente por el Banco, que había cobrado la deuda en su totalidad en 4 de octubre de 1965.

La demanda de Armstrong por la suma original de $15,552.91 fue satisfecha por PRAICO el 30 de noviembre de 1965 pagando $12,749.91. PRAICO *no* notificó a la firma de Acosta & Rodas, Inc. de la reclamación judicial de Armstrong ni del pago efectuado. Es importante señalar que la deuda con Armstrong era por razón de materiales en el proyecto de *Guánica*, en el cual la fiadora PRAICO *no tenía injerencia alguna y para el cual no existía contrato de fianza suscrito.*

Así las cosas, PRAICO suscribió el 7 de diciembre de 1965 una demanda en cobro —radicada el 10 de diciembre— contra Acosta & Rodas, Inc. por la suma de $100,000 en concepto de pagos *supuestamente efectuados* a terceras personas bajo el contrato de fianza de ejecución y el contrato de fianza de pago. Alegó también que la suma de $100,000 era líquida y exigible y que había hecho múltiples requerimientos para su pago. *Tales alegaciones no eran ciertas.*[1] El 14 de diciembre trabó embargo preventivo sobre unas propiedades muebles e inmuebles pertenecientes a Acosta & Rodas, Inc. y las sociedades gananciales del Arquitecto Remus E. Acosta-Ana Lydia Rodríguez y José A. Rodas-Carmen Álida Nazario.

---

[1] Esa demanda fue suscrita por el abogado original de PRAICO. En los recursos ante nos PRAICO ha estado representada por abogados distintos. El récord no contiene ningún indicio de que el abogado original, al firmar las alegaciones de la demanda, actuara en contra de los mejores postulados forenses que informa la Regla 9 de las de Procedimiento Civil. Tampoco refleja dudas, ni existen en nuestro ánimo, sobre la integridad y proceder profesional de sus actuales representantes legales.

Los bienes embargados fueron maquinaria, camiones y equipo de construcción que utilizaba Acosta & Rodas, Inc. en el proyecto Extensión El Rosario. Se embargó también una planta mezcladora de cemento (*batching plant*) localizada en Guánica, el producto de cuatro casas de dicha urbanización, varios certificados de acciones y los vehículos personales de los señores Rodas y Acosta. Estos últimos bienes los recuperaron el mismo día, previa prestación de fianza. Tal incautación provocó la total e inmediata paralización del proyecto, impidió que Acosta & Rodas, Inc. pudiera continuar y terminarlo, y promovió la aceleración del pago de las deudas de todos sus suplidores. La suspensión de las operaciones interrumpió a su vez la venta normal de las casas del proyecto, que constituía la fuente de dinero para amortizar el préstamo concedido por el Banco.

Dada la anterior situación, el 10 de marzo de 1966 el Banco y la PRAICO, *sin la intervención de Acosta & Rodas, Inc.*, suscribieron un documento tipo carta mediante el cual PRAICO se comprometió a gestionar y facilitar al Banco el mandamiento para el levantamiento del embargo. A cambio, el Banco relevaría a la fiadora de su responsabilidad de garantizar el pago de materiales y la terminación del proyecto Extensión El Rosario y se le entregarían 983 acciones embargadas del *Copamarina Beach Resort Corporation* y el equipo de construcción previamente incautado. A su vez, PRAICO también recibiría la suma de $12,749.91, que era la cantidad que indebidamente había pagado por concepto de materiales utilizados en el proyecto de Guánica a Carlos Armstrong e Hijos Sucesores, Inc.

A tal efecto, subsiguientemente PRAICO desistió del pleito contra Acosta & Rodas, Inc. y los señores Rodas y Acosta. Solicitó y obtuvo del Tribunal el correspondiente mandamiento para el levantamiento del embargo. En su moción pidió se dispusiera la devolución *inmediata* de los

bienes embargados a *los allí demandados*, a pesar de que, contrario a dicha manifestación, no tenía intención alguna de proceder con tal restitución por resultar ello incompatible con el mencionado documento suscrito el 10 de marzo de 1966, en el cual, en su carácter de fiadora, había estipulado que suministraría el mandamiento de levantamiento al Banco. Verificada la entrega del mandamiento al Banco, PRAICO no tomó acción alguna para proteger los bienes ni para procurar su devolución. Se desentendió totalmente de la remisión, condiciones y todo lo relacionado con dichos bienes y del destino final del referido mandamiento. El equipo se deterioró y con el tiempo perdió parte de su valor.

Durante todo este período de tiempo, Acosta & Rodas, Inc. y los señores Rodas y Acosta realizaron infructuosamente diligencias y gestiones tendentes a obtener el retorno de los bienes embargados. También efectuaron gestiones judiciales por conducto de sus representantes legales.

Ante tal situación, el 29 de abril de 1966 Acosta & Rodas, Inc. y los señores Rodas y Acosta demandaron a PRAICO solicitando indemnización por daños ascendentes a $718,850 más otras partidas por alegado *embargo ilegal.* PRAICO contestó y negó las alegaciones. No fue hasta pasados seis años, el 19 de septiembre de 1972, que ésta (PRAICO) formuló demanda de tercero contra el Banco aduciendo que a cambio de la entrega del mandamiento de levantamiento había quedado liberada de toda responsabilidad sobre el embargo trabado. El Banco, al contestar, admitió dicha dación y como única defensa opuso la prescripción.

A manera de paréntesis preliminar anticipamos que el tribunal sentenciador, en su momento, determinó que a la fecha del embargo original la fiadora no había notificado a Acosta & Rodas, Inc. ni a los señores Acosta y Rodas de la existencia de reclamación judicial alguna incoada por

suplidores relacionada con el proyecto Extensión El Rosario de Yauco. Tampoco hubo evidencia de que en o antes de la fecha del embargo hubiese mediado reclamación judicial de suplidores de dicho proyecto *contra* la fiadora, en virtud de la fianza de pago expedida por ésta. Ante tal realidad, y fundado en la evidencia practicada, el tribunal de instancia consideró que la intención de PRAICO y el Banco al otorgar el documento del 10 de marzo de 1966 fue obtener y permitir el uso ilegal e indebido de un procedimiento judicial mediante el traspaso y entrega del mandamiento para el levantamiento del embargo al Banco acreedor, para que éste, a su discreción, lo usara como medio coercitivo y contrario al fin para el cual se solicitó, ordenó y emitió. A juicio del foro judicial, ello constituyó un abuso de los procedimientos por ambas partes. Apoyó tal determinación en la premisa básica de que toda conducta posterior del Banco y la fiadora —en relación con el mandamiento y los bienes embargados— estaba plenamente prevista y contemplada en el contenido del referido documento. Como cuestión de hecho, el Banco "previamente" había gestionado y obtenido los servicios de su cliente, Ingeniero Alfonso Hernández Torres, para la terminación del proyecto Extensión El Rosario.

El foro primario también dictaminó que Alfonso Hernández Torres se hizo cargo del proyecto por encomienda del Banco el 26 de enero de 1966 y que los señores Acosta y Rodas, empleados en otros lugares, habían quedado forzosamente desvinculados como resultado del embargo. Las certificaciones a partir del 26 de enero de 1966 las hacía Alfonso Hernández y las mismas se llevaban al señor Rodas para que éste insertara su firma *proforma,* toda vez que desde esa fecha, la posición e intervención corporativa de Acosta & Rodas, Inc. se mantuvo por el Banco artificialmente como un mero sujeto interpuesto para sostener una apariencia jurídica de que esa corporación seguía operando como deudora del Banco y contratista

del proyecto Extensión El Rosario. Esta simulación quedó corroborada por la prueba desfilada, basada, entre otros factores, en que se pudo comprobar, de la evidencia admitida, que la cuenta corriente de Acosta & Rodas, Inc. fue manejada unilateralmente por el Banco a partir de la fecha del embargo, mediante la utilización de notas de crédito y débito preparadas por el mismo Banco sin que la corporación emitiera un solo cheque para controlar esos fondos o participara en forma alguna en su disposición.

El 18 de diciembre de 1968 el Banco radicó acción civil donde acumuló ocho causas de acción de ejecución de garantías hipotecarias constituidas sobre propiedades de Acosta & Rodas, Inc., y los matrimonios Rodas y Acosta. El total reclamado era $175,244.63 de principal más $24,246.84 por intereses acumulados. Posteriormente el Banco solicitó y obtuvo sentencia por desistimiento voluntario. El 22 de diciembre de 1970 radicó entonces el caso civil núm. 70-5195 en que acumuló otra vez las ocho causas de acción de ejecución de hipoteca objeto de la demanda anterior. Esta acción fue desestimada por inactividad judicial del Banco en junio de 1972.

Posterior a estos acontecimientos, el 14 de mayo de 1971, a instancia del Banco, José A. Rodas y Remus E. Acosta suscribieron un documento [2] notarizado en el cual asumieron por mitad la deuda de Acosta & Rodas, Inc. y su obligación para su cancelación.

Dicho instrumento, minuciosamente elaborado, establece que las garantías previamente entregadas al Banco para

---

[2] A la fecha de su firma habían advenido finales dos sentencias que, aunque en pleitos distintos, surgían de la misma causa de acción que origina el presente caso. En la primera el Tribunal Superior, Sala de San Juan, en el caso 66-5722 radicado con posterioridad al embargo por un acuerdo de Acosta & Rodas, Inc., condenó a PRAICO al pago de dicha deuda, y finalmente el Banco, en virtud del documento del 10 de marzo de 1966, liberó a la fiadora de responsabilidad por las fianzas. Bajo este mismo fundamento, en el caso 67-2078 del depositario Serrano se hizo una determinación de negligencia contra el Banco por haber omitido el cumplimiento de su deber de procurar el diligenciamiento y levantamiento del embargo, ya que para todos los fines del embargo el Banco había quedado en el lugar de la fiadora PRAICO.

garantizar los préstamos a nombre de Acosta & Rodas, Inc., quedarían en todo su vigor hasta el pago total de la deuda; que la acreencia a la cual se refiere el mismo surgía de una deuda contraída por Acosta & Rodas, Inc. para el financiamiento de la construcción del proyecto Extensión El Rosario; que Acosta & Rodas, Inc. se vio impedida de pagar esa deuda por la imposibilidad de terminar dicho proyecto luego de la acción judicial iniciada en su contra por PRAICO; y que el Banco procedió a hacer desembolsos para el pago total de todos los suplidores. Se añadieron dos cláusulas(3) mediante las cuales los señores Rodas y Acosta cedían la compensación por daños que finalmente obtuvieran en su pleito contra PRAICO por embargo ilegal, relevaban de toda responsabilidad al Banco y renunciaban a su favor toda reclamación o derecho exigible.

En virtud de este documento, en 16 de julio de 1973 el Banco radicó acción civil en el Tribunal Superior, Sala de

(3) Las cláusulas de referencia establecían:

"Acosta y Rodas, Inc., y los señores José A. Rodas y Remus Acosta y sus respectivas esposas y el Banco Crédito y Ahorro Ponceño se relevan mutuamente de cualquiera y toda responsabilidad con respecto a las transacciones realizadas por todos y cada uno de ellos con el Banco Crédito y Ahorro Ponceño, y con terceras personas y con respecto a las transacciones del Banco Crédito y Ahorro Ponceño con otras personas desde el comienzo del financiamiento de la Urbanización El Rosario en Yauco hasta esa fecha y asimismo renuncian mutuamente las partes a toda reclamación o derecho que tienen o puedan tener excepto que Acosta y Rodas, Inc., José A. Rodas y Remus Acosta y sus respectivas esposas aceptan su responsabilidad con respecto a cualquier deuda o crédito válido por el cual se responsabilice al Banco Crédito y Ahorro Ponceño y cuales deudas o créditos sean atribuibles al proyecto de la Urbanización El Rosario.

"Acosta y Rodas y los señores Remus Acosta y José A. Rodas y sus respectivas esposas ceden al Banco Crédito y Ahorro Ponceño la suma que pudiera Acosta y Rodas, Inc. o cada uno de ellos recibir a medida de compensación en la acción de daños y perjuicios que en la actualidad está pendiente en contra de la Puerto Rican American Insurance Company reduciendo de tal suma así cedida los gastos y honorarios pactados de los abogados que le correspondan a los abogados de Acosta & Rodas, Inc. No obstante lo anterior, en caso de que el total o parte del producto a ser recibido en dicho pleito sea necesario para evitar la quiebra o insolvencia de Acosta & Rodas individualmente y/o continuación del proyecto El Almaciego de Yauco. El Banco liberará aquellos fondos que sean necesarios para evitar tal quiebra o insolvencia."

San Juan, contra los esposos Acosta-Rodríguez en cobro de dinero y ejecución de hipoteca. Más tarde, el 28 de junio de 1974 también lo hizo contra los esposos Rodas-Nazario y Colinas de Yauco Development Corp. El tribunal trasladó los casos a la Sala de Ponce donde quedaron consolidados para vista con el caso original de daños por embargo ilegal.

El 29 de junio de 1976 los demandados Rodas y Acosta y sus respectivas esposas contestaron las demandas y formularon reconvención contra el Banco.

Ante tal amalgama de sucesos, el tribunal de instancia se vio en la necesidad y optó por ventilar y resolver conjuntamente la demanda de daños por embargo ilegal incoada por Acosta & Rodas, Inc. y los señores Rodas y Acosta contra PRAICO; la demanda de tercero de PRAICO contra el Banco, sustituido ahora por la Federal Deposit Insurance Corp. (FDIC); la incoada por el Banco en cobro de dinero y ejecución de hipoteca contra Acosta, Rodas y sus esposas; y las reconvenciones en estos dos últimos casos contra el Banco.

En síntesis, el tribunal a quo, en virtud de la prueba resumida, en sentencia de 11 de octubre de 1979 condenó a PRAICO y al Banco (FDIC) a pagar solidariamente: a Acosta & Rodas, Inc. $82,701.82, por ganancias dejadas de percibir y $88,000 por pérdidas materiales; a José Rodas y Remus E. Acosta, respectivamente, las cantidades de $10,000 por angustias y sufrimientos mentales causados por el cierre de su negocio; $10,000 por angustias y daños morales causados por humillación, pérdida de reputación profesional y pérdida de reputación comercial; $10,000 por daños y angustias morales causadas al ver el sufrimiento de sus esposas y familiares como consecuencia del embargo ilegal; $10,000 por las humillaciones sufridas al habérseles embargado sus automóviles personales; a José A. Rodas $25,000 por pérdida material a causa del embargo ilegal, más intereses legales desde el 19 de agosto de 1971 sobre

dicha suma. Decretó la nulidad del documento de 4 de mayo de 1971 otorgado entre las partes —Rodas, Acosta y el Banco— y de todas las obligaciones accesorias resultantes de dicha transacción. Dispuso además la anulación del contrato de prenda y de cesión en que el señor Rodas el 8 de enero de 1974 hizo reconocimiento de deuda a favor del Banco. También desestimó la demanda radicada por el Banco contra Rodas, Acosta y esposas; y la demanda contra tercero radicada por PRAICO contra el Banco; ordenó la cancelación y eliminación de gravámenes pendientes sobre propiedades inmuebles de Rodas, Acosta y sus respectivas esposas en los Registros de la Propiedad, y finalmente condenó a PRAICO a satisfacer la suma de $8,000 a Acosta & Rodas, Inc. y señores Acosta y Rodas por concepto de honorarios de abogados, costas y gastos.

Accediendo a peticiones independientes de la fiadora PRAICO y FDIC acordamos revisar.

## II

Analizaremos primero separadamente los señalamientos de error de PRAICO, a saber:

1. Al responsabilizar a la fiadora Porto Rican and American Insurance Company al pago de daños por el embargo trabado en bienes propiedad de los demandados a pesar de que la fiadora tuvo causa probable y suficiente para iniciar esa acción y no existe base alguna en la prueba que demuestre que el procedimiento se inició con el propósito de molestar o causar daño a los demandantes.

2. Al concluir que la firma Acosta & Rodas, Inc. se encontraba solvente.

3. Al imponer responsabilidad a la fiadora con motivo del embargo trabado, a pesar de que el contrato "General Agreement of Indemnity" otorgado por los demandantes Acosta & Rodas, Inc., por el Sr. Remus E. Acosta, por el señor José A. Rodas, y por sus respectivas cónyuges, disponía expresamente

que los demandantes habrían de indemnizar en todo momento a la fiadora y concedía a ésta el derecho de tomar cualquier acción que resultare necesaria para relevarse de sus obligaciones bajo la fianza en cualquier momento, aún cuando la fiadora no hubiere efectuado pago de dinero alguno.

4. Al responsabilizar a la fiadora por motivo del embargo trabado, a pesar de que el Artículo 1742 del Código Civil de Puerto Rico le concede el derecho a la fiadora de proceder contra el deudor principal, aún antes de haber pagado la fianza, cuando el deudor principal se encuentra en un estado de insolvencia o cuando la deuda se ha hecho exigible o la fiadora se ve demandada judicialmente para el pago de la obligación.

5. Incurrió en error que amerita la revocación de la sentencia al concluir que el acuerdo de fecha 10 de marzo de 1966 constituyó un uso ilegal e indebido de un procedimiento judicial.

6. Al imponer responsabilidad a la fiadora por motivo del embargo trabado a pesar de que la acción iniciada por la fiadora no terminó por sentencia firme a favor de los demandantes, sino que terminó mediante la radicación de un aviso de desistimiento sin perjuicio basado en un acuerdo de transacción en el cual los demandantes habían intervenido activamente y dieron su anuencia al mismo.

7. Incurrió en error al declarar sin lugar la demanda de tercero que fue instada por la fiadora Porto Rican and American Insurance Company contra el Banco Crédito y Ahorro Ponceño.

8. Al concluir que el equipo embargado se había deteriorado al punto de resultar una pérdida total e incurrió en error al conceder a la parte demandante la suma de $70,000.00 por concepto de pérdidas materiales.

9. Incurrió en error al conceder a la parte demandante la suma de $18,000.00 producto de una expropiación efectuada por el Estado Libre Asociado de Puerto Rico.

10. Incurrió en error al conceder a la parte demandante la suma de $82,701.82 por concepto de ganancias dejadas de percibir del proyecto Extensión El Rosario.

11. Incurrió en error al conceder daños exagerados y excesivos por la suma de $40,000.00 a cada uno de los demandantes por concepto de daños morales, angustias mentales, y daños a su reputación alegadamente ocasionados por el embargo.

Los primeros seis señalamientos de PRAICO cuestionan las conclusiones referentes a: (1) que el embargo fue ilegal, y (2) que el curso de acción adoptado por ella constituyó un curso ilegal e indebido del proceso judicial. Atendamos los méritos de estos seis planteamientos.

En primer lugar sostiene que estaba exenta de responsabilidad por el embargo, debido a que éste no terminó por sentencia firme a favor de los demandantes y sí por razón de desistimiento sin perjuicio basado en acuerdo de transacción en que éstos intervinieron y convinieron. Añade a su vez que hubo suficiente causa probable para el mismo, el cual no se inició con propósitos de molestar ni causar daño. No tienen razón. En *Ortiz* v. *Chase Manhattan Bank*, 109 D.P.R. 395 (1980), ante una contención similar, a la pág. 397 dijimos:

Hemos resuelto que es elemento substantivo de la acción por daños por embargo ilegal que el pleito dentro del cual se decreta el embargo termine por sentencia firme a favor de la persona cuya propiedad hubiese sido embargada. *Rodón* v. *Fernández Franco*, 105 D.P.R. 368, 370–371 (1976), y casos allí citados. *Argumenta el Chase que como el decreto de archivo por desistimiento no se hizo con perjuicio, la acción de reposesión no terminó por sentencia final y firme y por tanto carece de causa de acción el peticionario. No podemos aceptar esta posición. Equivaldría a sostener que no hay causa de acción por daños por embargo ilegal si en vez de vencer en juicio el demandado al embargante éste desiste de su acción antes de que recaiga sentencia en su contra.* Aceptarlo implicaría que la base de la causa de acción por

daños es la sentencia en contra del embargante y no el embargo ilegal. Si bien la sentencia es determinante de la ilegalidad del embargo, no es ella la única manera de hacer tal determinación, que puede hacerse también del pleito por daños y perjuicios. (Énfasis suplido.)

■ Este pronunciamiento es la culminación lógica de la vertiente iniciada en la discusión de este asunto en el 1919 en que determinamos que si del pleito principal se desistía, aun así se respondía de los daños ocasionados con motivo del embargo trabado, *Avilés* v. *Hijos de Rafael Toro*, 27 D.P.R. 671 (1919), ampliado en *De la Matta* v. *Carreras*, 92 D.P.R. 85 (1965). La pretensión de la recurrente —que el desistimiento fue la consecuencia de un acuerdo de transacción en el cual los demandantes recurridos intervinieron activamente y dieron su anuencia— no encuentra apoyo en la evidencia. La prueba documental en autos para sostenerla es una estipulación tipo carta fechada 10 de marzo de 1966 en donde tan *solo* aparecen las firmas de Radamés Mayoral Jr. y Jorge N. Andino, oficiales del Banco y PRAICO respectivamente. En dicho documento no surge firma que de forma alguna involucre a Acosta & Rodas, Inc. o a los señores Rodas y Acosta. De igual forma la evidencia testifical presentada ante la ilustrada juez de instancia no inclinó su discreción hacia tal versión. No existe, pues, prueba que justifique el distanciarnos y tomar posición distinta a la asumida por dicho foro.

En segundo lugar la fiadora impugna la conclusión de que Acosta & Rodas, Inc., se encontraba solvente. Bajo este supuesto niega tener responsabilidad por el embargo a base del artículo 1742 del Código Civil, 31 L.P.R.A. sec. 4916, que reconoce el derecho a proceder contra el fiado —aun antes de haber hecho pago alguno— "[e]n caso de quiebra, concurso o insolvencia". El planteamiento amerita cierta elaboración.

Es unánime el consenso entre los tratadistas sobre las razones de justicia que inspiran este precepto. Si bien la

fianza se constituye en garantía y para la seguridad del cumplimiento de una obligación en beneficio del acreedor, ello no es óbice para negarle al fiador —en ciertos casos de seria amenaza— aquellos medios o vías necesarios y adecuados que le permitan recobrar la indemnización a que tiene derecho. No obstante, no podemos perder de vista el carácter de excepción que informa la norma de referencia:

> Hemos dicho con repetición, que . . . si bien el artículo 1.838 [Código Civil nuestro, Art. 1737] le concede el derecho de indemnización en los términos que en su oportunidad expusimos, es lo cierto que ese derecho no puede ser puesto en el ejercicio hasta que el fiador haya hecho el pago de la obligación principal, toda vez que ese es el acto que da origen o sirve de causa a la indemnización citada.

> Esta es la doctrina establecida por el Código, según la que todos los efectos que la fianza produce entre el deudor y el fiador dependen exclusivamente del hecho del pago realizado por éste, y en rigor de principios, hasta que éste no tenga lugar, ningún derecho puede asistir al fiador para proceder contra el fiado.

> Sin embargo, hay casos en que la ley no puede menos de prescindir del rigorismo de dicha doctrina, facultando al fiador para proceder contra el deudor aun antes de haber pagado él en consideración a motivos poderosos de equidad, que la misma no debía desatender. Manresa, *Comentarios al Código Civil Español*, 1973, T. XII, pág. 433.

La naturaleza singular de la norma limita la facultad del fiador para obtener, antes de haber realizado pago alguno, que se le releve de la fianza,[4] o garantía,[5]

---

[4] "La eliminación de los riesgos de perjuicios para el fiador mediante la relevación de la garantía asumida, sólo puede lograrla el deudor principal mediante dos procedimientos: bien pagando la obligación fiada, con lo que extinguirá la accesoria de garantía sin daño para aquél, bien llegando a un acuerdo con el acreedor para que éste renuncie a la fianza o a su ejercicio. Sin entrar en el teórico y discutido problema de si la acción de relevación de fianza supone un regreso anticipado, la cuestión de más interés práctico se centra en precisar si, ante la negativa o la imposibilidad del deudor a pagar, resulta

estrictamente en aquellas situaciones contempladas y enumeradas en el articulado en cuestión. El apartado pertinente se refiere a los casos de quiebra, concurso e insolvencia. Las primeras dos, a diferencia de la última, requieren decreto previo oficial.[6] ¿Qué significa el concepto insolvencia? F. Seix nos dice:

posible la ejecución forzada y específica de su obligación. En general, la doctrina se manifiesta negativamente por entender que el fiador carece de acción directa contra el deudor para imponerle el cumplimiento coactivo de la obligación fiada o para procurar al acreedor tal cumplimiento.

"La exoneración de la fianza, como otra posibilidad para evitar los riesgos asumidos por el fiador, precisará siempre de un acuerdo con el acreedor por el que renuncie a la garantía o se comprometa a no ejercitarla. En realidad, queda al margen de la voluntad del deudor.

"Resulta pues, que la liberación del fiador a través de este primer remedio cuenta con escasas posibilidades de éxito. De una parte, porque dirigida contra el deudor principal la acción, exige de éste la realización de una prestación de hacer que no es susceptible de ejecución forzosa específica; de otra, porque el derecho del fiador no le autoriza, como he dicho, a imponer coactivamente el pago al acreedor; y finalmente, porque éste es un tercero ajeno a la pretensión que actualiza el fiador, al que no está obligado a liberar de su garantía, sin que, por otra parte, le puedan perjudicar los acuerdos convenidos entre deudor principal y subsidiario." (Escolios omitidos.) Guilarte Zapatero, *Comentarios al Código Civil y Compilaciones Forales* dirigidas por Albaladejo, Ed. Rev. Der. Privado, 1979, T. XXIII, pág. 243.

[5] "Para que la finalidad del precepto no resulte ilusoria, se faculta también al fiador para exigir del deudor una garantía que, en definitiva, le asegure la eficacia de su eventual acción de regreso, si se viera obligado a materializar el pago. Prescindiendo, por el momento, de las dificultades que, en ciertas situaciones, pueden surgir para el cumplimiento voluntario por parte del deudor de la pretensión del fiador, ésta debe entenderse observada cualquiera que sea la naturaleza de la garantía ofrecida aunque deba valorarse su idoneidad en función de la cuantía de la fianza.

"Ahora bien, si el deudor se niega a prestar la garantía solicitada o no la ofrece de las características necesarias para asegurar al fiador, ¿estará éste facultado para obtenerla coactivamente? Por las mismas razones expuestas anteriormente y en especial por tratarse de una prestación de hacer lo que incumbe al deudor para satisfacer al fiador su pretensión de que se le garantice el regreso, parece de suma dificultad admitir que pueda ser suplida la voluntad de aquél a los efectos de la constitución de la garantía, pero en cualquier caso, ante la negativa injustificada del fiador, podrá el fiador obtener un embargo preventivo de sus bienes, como observa COSSIO." (Escolios omitidos.) Ibíd., pág. 244.

[6] "El concurso y la quiebra habrán de estar declarados solemnemente . . ."

Pero la mera insolvencia no responde a semejantes solemnidades . . ." Scaevola, *Código Civil*, T. XXVIII, 1953, pág. 648.

El lenguaje corriente nos proporciona un concepto de insolvencia que en definitiva coincide con el concepto jurídico: insolvencia es la imposibilidad en que se encuentra el deudor de pagar sus deudas. *Insolvente es el que no tiene con qué pagar. Dicho con lenguaje más jurídico, insolvente es el que carece de bienes que puedan responder del cumplimiento de sus obligaciones.* (Énfasis suplido.) *Nueva Enciclopedia Jurídica*, 1965, T. XII.

Sobre el mismo concepto, pero desde una óptica y dinámica más amplia, Guilarte Zapatero expone:

En el caso de insolvencia no declarada judicialmente, a la que parece aludir el C.c. en este precepto, cierto sector de la doctrina patria, siguiendo el criterio de nuestro Derecho histórico, y coincidiendo con lo dispuesto en algún Código extranjero, opina que aún antes de una situación de insolvencia, resulta viable la acción del precepto comentado siempre que exista el peligro de llegar a ella, objetivado por la disminución de cierta entidad del patrimonio deudor, mediante actos encaminados a buscarla injustificadamente. Tal opinión, exacta respecto de nuestro Derecho histórico, debe reputarse dudosa frente al régimen del C.c.; probablemente, la referencia que éste hace a una situación de insolvencia, aunque no esté judicialmente declarada haya de entenderse como *actual y efectiva,* es decir, por una situación tipificada por la circunstancia de la insuficiencia patrimonial del deudor para satisfacer la totalidad de las obligaciones contraídas. *De suerte que, aunque la disminución patrimonial se produzca, mientras los bienes del deudor sean suficientes para cubrir las deudas existentes, no cabe hablar de insolvencia, lo que impide la interpretación extensiva de la norma y su aplicación al caso referido.* Como tampoco será posible hacerlo en el supuesto de una simple falta de liquidez que dificulte el pago de lo debido. *Parece, en suma, que el precepto equipara los supuestos de concurso y de quiebra al de insolvencia, entendiendo que, en aquéllos, ésta existe y ha sido oficialmente declarada; declaración que, por las circunstancias que sean, no se ha producido en la otra situación en la que, no obstante, concurren también las circunstancias objetivas de un pasivo mayor del activo del patrimonio deudor y haberse dejado de pagar las obligaciones*

(arts. 1.913 del C.c. y 874 del C.c.), *o, al menos, la primera de ellas*. (Énfasis nuestro y escolios omitidos.) *Comentarios al Código Civil y Compilaciones Forales* dirigidas por Albaladejo, 1979, T. XXIII, págs. 251–252.

Acogemos la interpretación restrictiva plasmada en los comentarios de Guilarte Zapatero. [7] Este autor, además aclara en sobre quién recae el peso de la prueba. [8]

Resulta también opinable si corresponde al fiador probar que el deudor se encuentra en situación de insolvencia o es éste, frente a la declaración de aquél, quien debe acreditar la disposición de bienes suficientes para responder del regreso del fiador, no siendo aplicable, por lo mismo, el precepto comentado. A esta última solución se inclina Scaevola. (Escolios omitidos.) *Op. cit.*, pág. 252.

■ De la glosa citada aflora la norma que nos interesa: aquel fiador que estime que su fiado se encuentra

---

[7] Es este quien más profundamente analiza el precepto o la norma en discusión. Con la excepción de Scaevola, los restantes tratadistas son muy parcos al abordar el tema de referencia; Puig Brutau, *Fundamentos de Derecho Civil*, 1956, T. II, Vol. II, pág. 579; Puig Peña, *Tratado de Derecho Civil Español*, 1973, T. II, pág. 578; Manresa, *op. cit.*, pág. 449; Diego Espín, *Manual de Derecho Civil Español*, 1974, Vol. III, pág. 637 y ss.; Albaladejo, *Derecho Civil*, 1980, T. II, Vol. II, pág. 475; Enneccerus, *Tratado de Derecho Civil*, 1966, T. II, Vol. 2, pág. 834.

[8] Expone: "Pero la mera insolvencia no responde a semejantes solemnidades, por más que, aunque fuese notoria, es visto que si el deudor lo niega, será preciso acreditarla. Ahora, lo de saber si por el mero hecho de alegarla y por el mero hecho de contradecirla, sin pruebas de una y otra parte, deberá reputarse existente, mejor dicho, si la carga de la prueba cae sobre el fiador, que tal vez en su conciencia lo sabe, pero le es difícil efectuarla, o sobre el deudor, que es favorecido por la fianza y a quien le es fácil la justificación de no ser insolvente para el pago total de la deuda, es una cuestión discutible, pues aun siendo cierto que, en términos generales, el peso de la prueba cae sobre quien alega los hechos o novedades, según prevé el artículo 1.214 respecto a quien exige el cumplimiento de las obligaciones, no es menos cierto que la afirmación de insolvencia entraña la negación de bienes, y por ello (consúltese la sentencia del Tribunal Supremo del 26 de enero de 1922), junto con la circunstancia de ser alegación de un fiador, que es caución de beneficencia, parece que en principio la prueba incumbe al deudor, la de tener bienes propios y suficientes para responder de la obligación caucionada, si bien y, a pesar de ello, en evitación de sorpresas desagradables, aconsejaríamos al fiador, demandante de tales garantías, la proposición de alguna prueba, por ejemplo, la testifical o la de haber sufrido un grave y trascendental quebranto económico." Scaevola, *op. cit.*, págs. 648–649.

en situación de insolvencia y desee asegurar su obligación debe, en primer término, tratar de obtener la liberación o exoneración de fianza —cosa la cual puede estar o no en las manos del fiador— y en segundo lugar, debe obtener garantías del fiado. De no lograr lo anterior podría entonces —luego de constatar y acreditar fehacientemente tal insolvencia— obtener el embargo preventivo. Claro está que la concurrencia de otras personas que garanticen solidariamente a su vez al fiado podría alterar este trámite. Habría que demostrar entonces la insolvencia de esos deudores solidarios. Tal solución es consecuencia lógica del carácter excepcional de la norma, justificada sólo por la naturaleza del contrato de fianza y por ser de justicia que el fiador obtenga o asegure sus bienes o recobre la indemnización a que tiene derecho. Es evidente que mientras el deudor o deudores solidarios tengan bienes suficientes, los del fiador no correrán peligro alguno. No existe, por tanto, causa alguna que excuse el uso de la excepción.

A la luz de los principios expuestos examinemos el trámite seguido por PRAICO que culminó con el embargo en que se funda la presente causa de acción. En su demanda de 7 de diciembre de 1965 —radicada el día 10— PRAICO como fiadora sencillamente solicitó del tribunal que condenara a los demandados recurridos al pago de la suma de $100,000 por concepto de pagos supuestamente efectuados por ella a terceras personas bajo el contrato de fianza de ejecución y el contrato de fianza de pago. No formularon alegación adicional alguna sobre insolvencia u otros extremos.

El 13 de diciembre solicitó el embargo. Resulta curioso que cinco (5) días antes —el 8 de diciembre— PRAICO había enviado una comunicación a los señores Rodas, Acosta y sus respectivas esposas —como deudores solidarios que garantizaban personalmente la corporación— requiriéndoles el envío de $92,500 para completar una reserva

por la suma de $100,000 para atender posibles pagos a suplidores bajo la referida fianza.

La prueba desfilada en instancia demostró fuera de toda duda que las alegaciones de la demanda presentada por PRAICO eran *falsas*. No había realizado pago alguno garantizado por la fianza y, por ende, no existía deuda vencida ni líquida exigible. La deuda de Acosta & Rodas, Inc. a Carlos Armstrong e Hijos Sucrs., Inc., no estaba comprendida ni garantizada por el contrato de fianza existente y fue pagada indebidamente por PRAICO.

El negocio de fianzas en Puerto Rico es una industria de amplio crecimiento, importante y muy lucrativa. Como todo tipo de empresa, el riesgo en mayor o menor grado, es parte integrante de su dinámica operacional. Ese riesgo y responsabilidad se multiplica cuando se actúa de mala fe. Si PRAICO, dada la situación económica general del negocio de la construcción, por la experiencia del pago de *una* deuda de Acosta & Rodas, Inc. —aunque indebidamente por no estar cubierta por la fianza— entendió honestamente que su acreencia peligraba debido a lo precario del estado financiero de Acosta & Rodas, Inc., debió hacer uso de los mecanismos y procedimientos correctos de ley y no proceder con falsedades ante el foro judicial para lograr sus propósitos. No existió ni en la demanda ni en la solicitud de embargo alegación alguna que imputare a Acosta & Rodas condición de insolvencia que ameritara tal causa de acción. Adviértase que la alegación de insolvencia surge por primera vez como *defensa* contra el planteamiento de embargo ilegal. PRAICO trató sin éxito de establecerla en instancia con prueba documental y testifical, incluso peritos. No pudo. Tampoco demostró la insolvencia de los deudores *solidarios* señores Rodas y Acosta y sus esposas. Como dijimos anteriormente, ese dato resulta esencial si se deseaba hacer uso de la excepción a tenor con el Art. 1742 de nuestro Código, en situaciones que concurren deudores solidarios. Coincidimos

con el tribunal a quo en que para la fecha del embargo la firma Acosta & Rodas, Inc. estaba solvente.

En tercer lugar, PRAICO sostiene que su actuación estaba autorizada y sancionada en virtud de un contrato denominado *"General Agreement of Indemnity"* firmado por los señores Rodas y Acosta y sus esposas, el cual en su cláusula Núm. 3 consignaba:

> 3. If for any reason the Surety shall be required or shall deem it necessary to set up a reserve in any amount to cover any contingent claim or claims, loss, costs, attorney's fees and disbursements and expenses in connection with any bond by reason of default of the Principal, abandonment of contract, liens filed, unpaid and past due bills, dispute with the owner or obligee, or for any reason whatsoever, and regardless of any proceedings contemplated or taken by the Principal or the pendencery of any appeal, the undersigned jointly and severally hereby covenant and agree immediately upon demand to deposit with the Surety, in current funds, an amount sufficient to cover such reserve and any increase thereof, such funds to be held by the Surety and collateral, in addition to the indemnity afforded by this instrument, with the right to use such funds or any part thereof, at any time, in payment or compromise of any judgment, claims, liability, loss, damage, attorney's and disbursement or other expenses; and if the Surety is required to enforce performance of this covenant by action at law or in equity, the costs, charges, and expenses, including counsel or attorney's fees, which it may thereby incur, shall be included in such action and paid by the undersigned. Demand shall be sufficient if sent by registered mail to the undersigned at the address given herein or last known to the Surety, whether or not actually received.

Aduce la fiadora que esta cláusula le permitía tomar cualquier acción que entendiese fuere necesaria para relevarla de toda obligación que surgiere de la fianza. No tiene razón. La cláusula transcrita establece taxativamente las circunstancias que le facultaban a la fiadora crear una reserva de fondos: para cubrir cualesquiera reclamaciones, pérdidas, costas, honorarios de abogado, y

desembolsos o gastos con relación a cualquier fianza. Claramente ninguna de estas situaciones estuvo presente cuando PRAICO demandó a Acosta & Rodas, Inc., y le embargó sus bienes, pues la fiadora no tenía que pagar la pretendida deuda por no estar cubierta por el contrato de fianza. Concluimos, por tanto, que PRAICO no podía invocar la referida cláusula como fundamento para validar el curso de acción que siguió ni puede levantarla ahora como defensa.

■ Objeta PRAICO además la conclusión del tribunal sentenciador de que el acuerdo de fecha 10 de marzo de 1966 constituyó un uso ilegal e indebido de un procedimiento judicial. El acuerdo en cuestión es un documento privado otorgado entre el Banco y PRAICO. Mediante el mismo esta última se comprometió a entregarle al Banco el mandamiento para el levantamiento del embargo expedido por el tribunal, a cambio de que el Banco le librara de responsabilidad bajo las fianzas otorgadas en relación con el proyecto Extensión El Rosario de Yauco. Respecto a este particular la ilustrada juez de instancia expresó:

En el presente caso tanto la PRAICO como el Banco Crédito y Ahorro Ponceño, antes, ahora Federal Deposit Insurance Corporation, se pusieron de acuerdo para que PRAICO respondiendo a dicho acuerdo acudiera ante este Tribunal a pedirle el Mandamiento para el levantamiento del embargo trabado sobre los bienes de las partes aquí comparecientes, manifestándole en esa ocasión al Tribunal que tal solicitud se hacía con el propósito de que se levantara el embargo y se devolviera inmediatamente los bienes embargados a los perjudicados cuando ya había acordado previamente con el Banco el que se entregaría ese Mandamiento a dicho Banco, no para levantar el embargo y devolver los bienes inmediatamente, sino para que el Banco utilizara dicho Mandamiento que PRAICO se había comprometido a suplirle con el fin de que el Banco obtuviera el control de los bienes y usarlo como lo usó, con el fin de privar totalmente a sus deudores de toda posibilidad de continuar con el proyecto y así satisfacerle las reclamaciones

y con el fin adicional de obtener como obtuvo, prestaciones que de no haber tenido dicho control no hubiese obtenido. Esto constituyó un craso y manifiesto abuso del procedimiento judicial que contribuyó a la agravación de los daños ocasionados por la situación desencadenada por el embargo ilegal, por lo cual PRAICO y el Banco son solidariamente responsables. *Alum Torres* v. *Campos del Toro*, 89 D.P.R. 305 (1963), a la pág. 324.

La discusión del recurrente PRAICO se limita a establecer que Acosta & Rodas, Inc. tuvo conocimiento de ese acuerdo y que no existe prueba que establezca que lo objetaron. No tiene razón. La evidencia en autos de forma definitiva y sin lugar a dudas sustenta la conclusión del foro de instancia. Procesal y sustancialmente hubo un claro abuso del derecho. *Soriano Tavárez* v. *Rivera Anaya*, 108 D.P.R. 663 (1979). En cuanto a la anuencia o no de los señores Acosta y Rodas en el referido acuerdo —conforme dispusiéramos al discutir el primer error— éstos no intervinieron ni lo autorizaron.

■ Resueltos los primeros seis errores, concentrémosnos en los restantes. El séptimo gira en torno a la desestimación de la demanda contra tercero instada por PRAICO contra el Banco. En estricto derecho procesal, fue cometido. No es posible encontrar cocausante del daño, y por ende codeudor solidario, a una parte que entró al pleito por vía de demanda contra tercero, cuando a su vez se está desestimando esta última. Aunque ello no tiene efecto práctico alguno en cuanto a la reclamación de Acosta & Rodas, Inc., el dejar de así proveerlo privaría a PRAICO de la adjudicación inmediata de su derecho a nivelación. Procede modifiquemos la sentencia en ese extremo.

Los próximos cuatro errores versan sobre la estimación y adjudicación de daños. Se le imputa error en la concesión: de la suma de $70,000 a Acosta & Rodas, Inc. por concepto de pérdida total del equipo de construcción

embargado; (⁹) de $18,000 producto de una expropiación del E.L.A. de un solar embargado perteneciente a dicha entidad; de $82,701.82 por concepto de lucro cesante; y de $40,000, como compensación exagerada y excesiva a los demandantes Rodas y Acosta por sus angustias mentales y morales y daños a la reputación.

En su parte dispositiva la sentencia condenó a PRAICO y al Banco a pagar $88,000 a Acosta & Rodas, Inc. por concepto de pérdidas materiales. Se desglosa dicha cantidad en: $70,000 de los bienes embargados y $18,000 por concepto de pérdida por compensación concedida por el E.L.A. del solar expropiado. Para arribar a la cantidad de $70,000 del equipo *dedujo* —de una hipoteca de bienes muebles en favor del Banco de 20 de diciembre de 1965 en cuyo documento las partes estipularon que esos bienes se hallaban en buen estado, libre de cargas y gravámenes y valían $75,000— la suma de $5,000 de una venta de la planta mezcladora de cemento (*batching plant*) acreditados por el Banco a la cuenta de Acosta & Rodas, Inc. Examinemos la procedencia de estas compensaciones.

El equipo de construcción después del embargo fue depositado en el Garage Fao en Ponce, cuyo propietario, Samuel Serrano, fue nombrado depositario. Al cabo de un año, en diciembre de 1966 el equipo pasó a manos de Narciso Jusino, mecánico a quien le fue encomendada su reparación. Sobre qué ocurrió con posterioridad hubo controversia de hechos entre las partes. Los recurrentes PRAICO y FDIC señalan que en ese momento el equipo le fue entregado a la firma Acosta & Rodas, Inc., la cual contrató con Jusino para realizar las reparaciones al equipo —por los desperfectos sufridos durante el tiempo que estuvieron en poder del depositario Serrano— las

---

(⁹) Consistió de un camión marca Ford Pick-Up modelo 1955; camión marca International modelo 1954; loader NMY 70-7096 Massey Ferguson 203X; mezcladora y motor gasolina Briggs y Shaton de gasolina; loader serie 4026063; truck International sin motor; ligadora Ransong; truck Ford, motor en reparación; y planta mezcladora de cemento (*batching plant*).

cuales serían pagadas por el Banco. El equipo fue recogido y reparado por Jusino. Luego, con el transcurso del tiempo, se deterioró totalmente debido a que nadie se interesó más por éste.

Tanto PRAICO como la FDIC descansan en el testimonio de Jusino para sostener esta posición. A tales efectos solicitaron y obtuvieron de este tribunal apelativo la transcripción de su declaración. Jusino, en lo pertinente, atesta que el señor Acosta, a quien conocía y quien había sido su cliente, le solicitó que le reparara un equipo que le había sido embargado. Le informó que el arreglo tendría que hacerse por medio del Banco, pues era éste quien iba a pagar. Declaró además que el señor Acosta lo acompañó al Banco, donde se llegó a un acuerdo mediante el cual el Banco le daría una cantidad (tercera parte) de adelanto y cuando finalizara el trabajo le completaría la totalidad. Así las cosas el equipo fue trasladado a su taller, donde fue reparado. Posteriormente fue acompañado por el señor Acosta al Banco, donde le fue entregado el resto del dinero. Jusino declaró que a partir de entonces le hizo incontables llamadas al señor Acosta para que lo recogiera, lo cual no hizo, y con el paso del tiempo se deterioró totalmente con excepción "del *batching plant*", el cual el señor Rodas vendió.

El tribunal de instancia no dio crédito a este testimonio luego de aquilatarlo a la luz de un examen integral de la prueba. Hemos de respetar tal apreciación. Un análisis riguroso de la declaración de Jusino necesariamente no nos convence de que efectivamente mediara, en la forma que se nos sugiere, la entrega del equipo a Acosta & Rodas, Inc. Aparte de varias inconsistencias esenciales, hay dudas de la fecha en que efectivamente el equipo se puso a disposición de Acosta & Rodas, Inc. El equipo supuestamente entregado estaba incompleto.[10] Mientras se afirma

---

[10] De acuerdo con la evidencia que consta en autos, fueron nueve las unidades embargadas y todas en perfectas condiciones. No obstante, en la

que el señor Acosta vendió el *batching plant,* es el Banco quien recibe el dinero por concepto de la venta. Ante estas circunstancias se impone la autorrestricción y deferencia a las determinaciones del tribunal a quo. No están presentes circunstancias extraordinarias, error manifiesto en la apreciación de la prueba, indicios de pasión, prejuicio o parcialidad que nos mueva a descartarlas. *La Costa* v. *La Costa,* res. en 21 de enero de 1982; *Ortiz* v. *Cruz Pabón,* 103 D.P.R. 939, 946–947 (1975); *Morán Simó* v. *Gracia Cristóbal,* 106 D.P.R. 155, 161 (1977). No se cometió el error apuntado.

Se aduce además por los recurrentes que hubo error al conceder la suma de $18,000 a Acosta & Rodas, Inc., producto de una expropiación por parte del E.L.A. de uno de los bienes sujeto a embargo. La PRAICO nos señala que ella no tuvo intervención alguna en el manejo de esos fondos y que la prueba presentada demostró que el Banco acreditó el producto de la expropiación a las deudas y obligaciones que con ellos tenían los demandantes. El bien en cuestión se encontraba en manos del Banco en virtud del embargo ilegal efectuado por PRAICO y los subsiguientes manejos ilegales entre PRAICO y el Banco. La suma por concepto de la expropiación nunca fue entregada a Acosta & Rodas, Inc. y más bien fue acreditada a unas supuestas obligaciones, las cuales, como más adelante discutiremos, no existían. Procede, por tanto, sostener la decisión del tribunal de instancia en este particular.

■ PRAICO y FDIC (en sustitución del Banco) plantean la ausencia de perito para sostener la partida de lucro cesante, ausencia de factores de costos y gastos en el récord, y controversia en cuanto a la situación del proyecto al momento del embargo. Estos señalamientos no proceden. Ante la abundante prueba documental y los testimonios

declaración del señor Jusino aparece que eran tan solo seis las que le fueron entregadas, y había una inservible.

ofrecidos por las partes —aunque no necesariamente en calidad de perito y sí personas de vastos conocimientos en el negocio de préstamos y construcción— el planteamiento erigido en la falta de un perito por los demandantes no puede sostenerse. La naturaleza de los daños, en unión a la prueba, permitían al juzgador hacer las inferencias necesarias y pertinentes.

Bajo igual razonamiento, tampoco tiene mérito la segunda objeción. Ante el cúmulo de datos financieros relevantes al negocio de Acosta & Rodas, Inc. desfilados y traídos en evidencia por las partes, no es posible argumentar que el tribunal no tuviera ante sí factores de costos y gastos para apoyar su decisión. La tercera objeción levantada se refiere a la controversia en cuanto al estado en que se encontraba el proyecto al momento del embargo. En la prueba presentada hay por lo menos tres documentos que ofrecen versiones diferentes. Curiosamente todos fueron, en una u otra forma, sancionados por el Banco. Dicha situación fue minuciosamente analizada por la ilustrada juez de instancia, quien, en su fundamentada sentencia, concluyó:

> Contrario a como sugiere el Banco, las admisiones y manifestaciones de éste, de octubre de 1965 y enero de 1966, ponen en entredicho lo manifestado y admitido por el mismo Banco, con posterioridad a esa fecha y no a la inversa, como erróneamente parece entender el Banco. Si el Banco pone tanto énfasis en dichas contradicciones, aún olvidándose de las contradicciones propias y de las de Alfonso Hernández Torres, es lógico suponer que debió estar muy consciente de ellas y debió actuar de conformidad con las mismas, particularmente a la fecha de octubre de 1965 y de enero de 1966, fechas en que había realizado estudios que necesariamente tuvo que hacer en forma cuidadosa y minuciosa, toda vez que era para la concesión de ampliaciones de crédito, al préstamo anterior de Acosta & Rodas, Inc., de $30,000.00 en octubre y en exceso de un cuarto de millón de dólares en enero.

A la fecha de 4 de marzo de 1966 cuando se firma el contrato con Acosta & Rodas, Inc., la alegada contradicción debió ser manifiesta. Sin embargo, a pesar de todo lo anterior ni al momento en que el Banco hace el estudio para la aprobación de un crédito adicional del status del proyecto para la aprobación de un crédito adicional de $30,000.00 en octubre de 1965 ni al momento en que el Banco hace el estudio físico y financiero para la aprobación de la ampliación del préstamo de 26 de enero de 1966, ni al momento en que aprueba las certificaciones que somete Alfonso Hernández Torres entre enero 26, 1966 y 4 de marzo de 1966, ni a la fecha en que se firma el documento de 4 de marzo de 1966, ni con posterioridad a esa fecha cuando se someten otras certificaciones por Alfonso Hernández Torres que también aprueba y paga el Banco, dicho Banco hace señalamiento alguno de la contradicción ni hace reclamación alguna por los alegados trabajos indebidamente certificados o no realizados por Acosta & Rodas, Inc.

Basado en lo anterior y en la prueba, el tribunal determinó que la situación del proyecto era la siguiente: había 42 unidades de vivienda (casas) terminadas, de las cuales 29 estaban acreditadas y 13 sin acreditar; 21 en proceso de construirse; 7 por comenzarse y 3 sin certificar. Tales determinaciones encuentran suficiente apoyo en la prueba. No existe el más mínimo indicio de error o prejuicio en su apreciación, ni están presentes circunstancias extraordinarias que nos muevan a intervenir con ésta.

Partiendo de la premisa anterior, el foro primario procedió a computar el lucro cesante. Tomó en consideración varios factores, a saber, el producto de la venta de las casas, los costos para terminarlas, las deudas con el Banco, el pago a los suplidores y la suma obtenida en la expropiación forzosa. Luego de realizados los cálculos matemáticos correspondientes, adjudicó la cantidad de $82,701.82. La recurrente FDIC nos señala, en la alternativa, que aun bajo ese método se cometieron varios errores en dichos cómputos. Únicamente en lo último estamos de acuerdo. Nos explicamos.

■ El tribunal incluyó la suma de $18,000 concedida a Acosta & Rodas, Inc. en la expropiación forzosa. Al hacerlo incidió, pues dicha cantidad estaba comprendida en la adjudicación de las pérdidas materiales. No puede concederse dos veces la misma partida. Debe restarse de la indemnización en concepto de lucro cesante. Se cometió además un error matemático al computarse el producto de la venta de las 21 unidades en proceso de construcción. El tribunal erró al estimar en $281,523.67 dicho total, cuando su multiplicación por el precio promedio de $13,358.57 arroja un resultado de $280,529.97. La diferencia de $993.70 debe también deducirse.

Existe además una partida de $12,749.91 que merece reducirse. Corresponde a la deuda de Acosta & Rodas, Inc. con Carlos Armstrong e Hijos, Sucrs. pagada por PRAICO. Hemos visto que posteriormente el Banco indemnizó a PRAICO por dicho pago y la liberó de responsabilidad bajo las fianzas, a cambio del mandamiento de levantamiento del embargo y la obtención de los bienes embargados. La corporación demandante no objetó expresamente dicho pago. El Banco podía reclamarle lo que pagó. Art. 112, Código Civil, 31 L.P.R.A. sec. 3162.(11) Correspondía pues rebajarse dicha cantidad de esta partida.

Las mencionadas deducciones conllevan que el total de la partida de lucro cesante sea únicamente de $50,958.11 y no $82,701.82. Se modificará así la sentencia.

■ Por último, en relación a lo adjudicado por daños morales y angustias mentales, salvo la cuantía de $10,000 por el embargo de los automóviles propios de los señores

---

(11) El mismo reza:

"Puede hacer el pago cualquiera persona, tenga o no interés en el cumplimiento de la obligación, ya lo conozca y lo apruebe, o ya lo ignore el deudor.

"El que pagare por cuenta de otro podrá reclamar del deudor lo que hubiese pagado, a no haberlo hecho contra su expresa voluntad.

"En este caso sólo podrá repetir del deudor aquello en que le hubiera sido útil el pago."

Rodas y Acosta —por ser esa cuantía altamente desproporcionada en vista de que ellos levantaron dicho embargo el mismo día— concluimos que es razonable la valoración del tribunal. Los daños experimentados por los demandantes así lo justifican. Sufrieron la pérdida de su negocio —fuente principal de ingresos—; fueron desacreditados personal y profesionalmente; vieron afectado su crédito en los bancos y en las firmas comerciales; y estuvieron expuestos a las humillaciones y angustias que conlleva un embargo injustificado de esta magnitud y naturaleza, no sólo de bienes del negocio, sino los personales también. Excepto la partida de $10,000 antes mencionada, que reducimos a $1,000 —*cf. Rivera* v. *Rossi,* 64 D.P.R. 718 (1945)— no existe razón alguna de peso por la cual debamos variar las restantes adjudicaciones. No son manifiestamente exageradas. *Urrutia* v. *A.A.A.,* 103 D.P.R. 643, 647 (1975).

### III

Concentremos nuestra atención en los errores argumentados por FDIC, en su carácter propio y en representación del Banco, a saber:

1. La sentencia recurrida viola la Cláusula de Supremacía de la Constitución Federal, Artículo VI, Cláusula 2, el Artículo 9 de la Ley de Relaciones Federales y la ley que crea a la Federal Deposit Insurance Corporation al no reconocer la dualidad de comparecencia de la FDIC.

2. La decisión recurrida, en tanto pueda considerarse como una sentencia en contra de la FDIC en su carácter corporativo, viola la Cláusula de Supremacía de la Constitución Federal, Artículo VI, Cláusula 2, el Artículo 9 de la Ley de Relaciones Federales y la ley conocida como "Federal Tort Claims Act", 28 U.S.C. sección 1346.

3. El Tribunal Superior erró al decretar la nulidad del contrato del 14 de mayo de 1971 (Exhibit T-3) y las

obligaciones suscritas como resultado del mismo, al no incurrir el Banco Crédito y Ahorro Ponceño en fraude o falsa representación en relación a la negociación de dicho acuerdo.

4. El Tribunal Superior erró al no decretar que Acosta y Rodas confirmaron el contrato T-3, curando así cualquier vicio de consentimiento en el mismo.

5. El Tribunal Superior erró al no decretar que las reconvenciones de los apelados José A. Rodas y Remus Acosta, alegando la nulidad de las obligaciones del BCAP, están prescritas.

6. El Tribunal Superior erró al determinar que las obligaciones que fueron objeto de las demandas del BCAP son res judicata y no son exigibles en derecho.

7. El Tribunal Superior erró al determinar que la FDIC responde por actos en que no participó el BCAP, y en decretar la solidaridad con respecto a dichos actos.

8. El Tribunal Superior erró al determinar que la demandante-recurrida Acosta & Rodas, Inc. cargó con el peso de la prueba y estableció ganancias dejadas de percibir.

9. El Tribunal Superior erró al conceder una partida por pérdida total del equipo ante evidencia no contradicha de que el equipo fue reparado y devuelto, y en no determinar que existió prescripción con relación a dicha determinación.

10. El Honorable Tribunal Superior erró al imponer condenas por sufrimientos morales excesivos y desproporcionados.

11. El Honorable Tribunal Superior erró al no reconocer los derechos de compensación de una institución bancaria.

Examinaremos conjuntamente los primeros dos errores. Básicamente alega —bajo la hipótesis de que la sentencia recurrida sea válida— que por razón de no especificar la capacidad de la condena de la FDIC, podría entonces

estimarse que fue dictada en su contra en su carácter corporativo. Se aduce que de ser así, el efecto sería que la FDIC respondería con sus fondos corporativos generales y no con los activos del Banco, situación que ocurre cuando el síndico es responsable. Se argumenta que ello iría en contra de la ley que crea la FDIC y violaría la Cláusula de Supremacía de la Constitución federal, Art. VI, Cláusula 2.

A los fines de entender este señalamiento, debemos aclarar que la FDIC compareció y sustituyó al Banco en su carácter de síndico en el caso civil núm. 66-1342 como tercera demandada. El decreto impugnado expresó:

> Se condena al Banco Crédito y Ahorro Ponceño, antes, ahora Federal Deposit Insurance Corporation, solidariamente con la PRAICO al pago de las sumas anteriormente relacionadas.

■ *Se cometió el error.* Nos explicamos. La doctrina federal reconoce el papel dual del FDIC como corporación y síndico. *FDIC* v. *Godshall*, 558 F.2d 220 (1977); *Freeling* v. *Sebaing*, 296 F.2d 244 (1961); *FDIC* v. *Rockelman*, 460 F.Supp. 999 (1979). Es en esta última capacidad que responde por las deudas de un banco insolvente y su responsabilidad está limitada a satisfacer los débitos de los activos del banco. No alcanza a su propio patrimonio. 12 U.S.C. sec. 1823(e); *Colonial Bank & Trust Co.* v. *American Bankshares*, 439 F.Supp. 797 (1977); *FDIC* v. *James T. Barnes Co.*, 453 F.Supp. 81 (1978). Por tanto, la sentencia del tribunal de instancia debió especificar que la FDIC respondía únicamente en su carácter de síndico y así procede su modificación.

En su tercer planteamiento imputa error al tribunal a quo de decretar la nulidad del contrato del 14 de mayo de 1971 y por ende las obligaciones nacidas del mismo.

Se refiere al documento notarizado que en forma de carta suscribieron los señores Rodas, Acosta y el Banco. En éste se expresa que la deuda de Acosta & Rodas, Inc.

sería asumida mitad por Rodas y la otra mitad por Acosta; que las garantías entregadas al Banco para asegurar los préstamos a nombre de Acosta & Rodas, quedarían en vigor hasta el pago total de la deuda y que la acreencia referida en el mismo surgía de una deuda contraída por Acosta & Rodas, Inc. para el financiamiento de la construcción del proyecto Extensión El Rosario, la cual se vio impedida de pagar por la imposibilidad de terminar dicho proyecto luego de la acción judicial y el embargo incoado por PRAICO. Se consigna además la cesión al Banco de los daños y perjuicios que pudieran recibir los señores Acosta y Rodas en su pleito contra PRAICO.

Como expusiéramos antes, la prueba revela que mediante el mencionado documento el Banco perseguía que los señores Acosta y Rodas reconocieran como suya la deuda por la cantidad aproximada de $175,244.63 representativa del déficit resultante del proyecto El Rosario. Ciertamente el proyecto fue iniciado por Acosta & Rodas, Inc. y ellos se constituyen en codeudores solidarios ante el Banco. Sin embargo, no es menos cierto que luego del embargo y la subsiguiente intervención del Banco —culminando con la contratación por éste de Alfonso Hernández para la terminación del proyecto— la firma Acosta & Rodas, Inc. no jugaba papel significativo alguno; más bien era un sujeto pasivo por razón de las circunstancias y era el Banco quien tenía en sus manos el contrato real de toda la situación. Es éste quien impone el nuevo contratista y aprueba nuevas líneas de crédito. Ante este cuadro fáctico la ilustrada sala sentenciadora consignó:

Concluímos como cuestión de derecho que el Banco con su conducta dolosa, engañosa y coactiva contribuyó a la creación del déficit en el proyecto Ext. El Rosario cuyo déficit el propio Banco admitió sirve de base a las acreencias que ahora pretende cobrar y se produjo como consecuencia directa del embargo trabado por la PRAICO. Semejante conducta contradictoria no tiene cabida en nuestro derecho. Resolver en favor de la procedencia de la demanda en los

casos 76-3693 y 76-3694 frente a estas circunstancias equivaldría a permitirle al Banco que se beneficiara de sus propios actos dolosos, engañosos, culposos y negligentes. *International General Electric* v. *Concrete Builders, Inc.*, 104 D.P.R. 871 (1976).

En virtud de esta determinación dictaminó:

Resolvemos como cuestión de derecho que el reconocimiento de deuda que el Banco gestionó y obtuvo del señor José A. Rodas omitiéndole el hecho que le constaba al Banco en ese momento del engaño perpetrado en el documento de mayo 14, 1971 así como del pleito radicado en el caso 70-5195 había sido desestimado en el mes de junio de 1972, constituyó omisión de hechos esenciales que de haber sido conocidos por el señor José A. Rodas hubiesen motivado que éste no firmara dicho documento, por lo cual dicho reconocimiento de deuda es nulo por haber incurrido el Banco en dolo en la obtención del mismo.

En la discusión de este error la FDIC se limita a alegar que los señores Acosta y Rodas conocían o debieron haber conocido algunos de los hechos que según el tribunal le fueron ocultados por el Banco. No se cometió el error.

El dolo en el presente caso no surge de un hecho o situación aislada susceptible de ser plena y fácilmente detectada en sus inicios. Nace del conjunto y la evolución de circunstancias y manejos engañosos del Banco —discutidos anteriormente— que indujeron a los señores Acosta y Rodas a erróneamente creer que eran responsables de la referida deuda. No es hasta que se dilucidan judicialmente los casos que de manera clara, concreta y concluyente se detecta en toda su extensión y dimensión.

Nuestro Código Civil en su Art. 1221 dispone:

Hay dolo cuando con palabras o maquinaciones insidiosas de parte de uno de los contratantes, es inducido el otro a celebrar un contrato que, sin ellas, no hubiera hecho. 31 L.P.R.A. sec. 3408.

A base de la prueba admitida y creída por el tribunal de instancia —y en ausencia de prueba convin-

cente de que los señores Acosta y Rodas hubieren cometido falta alguna— concluimos que todas las circunstancias anteriores y coetáneas al referido contrato del 14 de mayo de 1971 les indujeron a firmarlo, y tales condiciones constituyen maquinaciones insidiosas del Banco que dan lugar al dolo grave que requiere nuestro ordenamiento jurídico para que se produzca la nulidad del contrato. Art. 1222 del Código Civil. (12) Véase *Márquez* v. *Torres Campos,* 111 D.P.R. 854 (1982).

Como cuarto error discute la FDIC —bajo el supuesto de que existió dolo en el contrato de 14 de mayo de 1971— que hubo confirmación de dicho contrato por parte de los señores Rodas y Acosta. Argumentan en primer lugar que como éstos pagaron parte de la deuda contenida en los pagarés suscritos por motivo de dicho contrato luego de conocer la causa de nulidad, lo convalidaron. Alegan en segundo término que la ausencia de reclamación dentro del período de cuatro años a partir de la firma del contrato lo confirmó por disposición expresa de ley. A tal efecto invoca el período de cuatro años dispuesto en el Código Civil para incoar una acción de nulidad después de la consumación de un contrato.

En cuanto al primer argumento —tesis de la confirmación tácita del contrato por el hecho de que los señores Rodas y Acosta realizaron pagos— no tiene razón.

El Art. 1261 del Código Civil dispone:

La confirmación puede hacerse expresa o tácitamente. Se entenderá que hay confirmación tácita *cuando con conocimiento de la causa de nulidad y habiendo ésta cesado,* el que tuviera derecho a invocarla ejecutase un acto que implique necesariamente la voluntad de renunciarla. (Énfasis suplido.) 31 L.P.R.A. sec. 3522.

---

(12) Reza:

"Para que el dolo produzca la nulidad de los contratos, deberá ser grave y no haber sido empleado por las dos partes contratantes." 31 L.P.R.A. sec. 3409.

Comentando éste y otros artículos referentes al tópico de la confirmación, Manresa expone:

Es ante todo la confirmación una forma de voluntad, una declaración de ésta, y como tal, con independencia del acto a que se refiera, exige en sí misma que concurran las condiciones de libertad, conocimiento y claridad que se necesitan en el consentimiento, tratándose de contrato, no siendo necesaria la conformidad de ambas partes, puesto que la confirmación sólo exige la voluntad de aquel que puede invocar la nulidad del convenio. Consecuencia de lo dicho es que la confirmación pueda invalidarse también por error, dolo, violencia, intimidación, falta de capacidad o ilicitud.

Bajo ese aspecto del error, y relacionando ya la confirmación con el acto a que se refiere, se necesita el conocimiento del vicio de nulidad por parte de quien confirma el contrato, según lo declara el artículo 1311, que si bien enumera este requisito como el de haber cesado la causa de nulidad (ya examinado al tratar del tiempo en que la confirmación puede hacerse), al ocuparse de la tácita lo comprende como esencial y aplicable de igual modo a la expresa. Ese conocimiento del vicio de nulidad debe suponerse, salvo cuando fuera error o dolo, en quien contrató personalmente, no sucediendo lo propio cuando se contrató por apoderado o se trata de los herederos del contratante.

Para que la confirmación purificase el acto inicial viciado sería preciso, como es lógico, que hubiese desaparecido o cesado la causa de nulidad del acto inicial, según se infiere de los términos del artículo 1311 del Código Civil. (S. 6 noviembre 1948.)

La confirmación supone además, el propósito de renunciar a la acción de nulidad, propósito que puede manifestarse de varios modos, dando origen esta diferencia a la clasificación de que pasamos a ocuparnos. Manresa, *Comentarios al Código Civil Español*, 1967, T. VIII, Vol. 2, págs. 897–898.

██ De lo anterior se desprende que para que sea válida la confirmación tienen que concurrir los siguientes tres requisitos, a saber: que se haga la confirmación por la persona que podría ejecutar la acción de nulidad; que sea

con conocimiento del vicio del contrato; y que el vicio o causa de nulidad haya desaparecido.

Sobre el peso de la prueba Manresa señala que:

. . . quien rechace la nulidad, fundada en que hubo confirmación, deberá acreditar el hecho en que ésta consistió, el conocimiento de que de los defectos del contrato tenía la otra parte y el propósito que ésta reveló de renunciar a la acción de nulidad, bien de modo expreso, bien porque sea la significación del acto ejecutado. Manresa, *op. cit.*, pág. 902.

La FDIC alega que el hecho de que los señores Rodas y Acosta realizaron abonos en pagos de la acreencia del Banco que surgió del contrato impugnado, es suficiente prueba de la confirmación. Tampoco tiene razón. El Banco no pudo demostrar con preponderancia de la prueba que ellos conocieran las causas (el dolo) que motivaban la anulabilidad del contrato al momento de satisfacer los mencionados pagos. No está presente el segundo requisito exigido por la doctrina, y por tanto no procede tal defensa.

Como quinto error aduce que el tribunal a quo incidió al no decretar prescritas las *reconvenciones* de los apelados Rodas y Acosta en los casos civiles núms. 76-3893 y 76-3894, en las cuales ellos levantaron la defensa de dolo consistente en que el Banco les había inducido a suscribir el documento en que se responsabilizaban individual y personalmente por una deuda inexistente. Como indicáramos previamente dicho convenio lleva fecha de 14 de mayo de 1971. Los mencionados pleitos se iniciaron en 1976. La FDIC en sustitución del Banco alega que el contrato se suscribió y consumó el mismo 14 de mayo de 1971 y, por ende, no podían levantar la defensa de dolo pasados los cuatro años desde la consumación del contrato. No tiene razón.

El Código Civil, en lo pertinente del Art. 1253 (31 L.P.R.A. sec. 3512) dispone:

La acción de nulidad solo durará cuatro años.

Este tiempo empezará a correr:

.    .    .    .    .    .    .    .

En los [casos] de error o dolo, o falsedad de la causa, desde la consumación del contrato. . . .

En cuanto a la vida de un contrato se ha dicho que:

La vida del contrato tiene tres fases o momentos principales, que son: la generación, la perfección y la consumación. La primera comprende los preliminares o proceso interno de formación del contrato. La segunda, el nacimiento del mismo a la vida jurídica. La tercera, el cumplimiento del fin para que se constituyó el contrato o, lo que es igual, la realización y efectividad de las prestaciones derivadas del mismo. Castán, *Derecho Civil Español Común y Foral*, T. III, págs. 523–525.

■■■ La consumación ha sido definida por el Tribunal Supremo español en su sentencia del 4 de mayo de 1943 como:

. . . el cumplimiento de los mismos [contratos], que se produce por el de las obligaciones que contienen, y del que se sigue, como consecuencia, la extinción del vínculo contractual.

O sea, que un contrato se consuma cuando las partes cumplen con las prestaciones a las cuales se obligaron en el convenio. En el caso ante nos, los apelados Rodas y Acosta suscribieron el contrato con el Banco acordando que la supuesta deuda de Acosta & Rodas, Inc. sería dividida y pagada por ellos por mitad. Al no satisfacer la totalidad de esa deuda fueron entonces demandados. Es evidente, pues, que no habiendo cumplido Acosta y Rodas con sus prestaciones, no se había consumado el contrato impugnado y estaban a tiempo para levantar el dolo al momento de ser demandados. Sentencia del Tribunal Supremo de España de 24 de junio de 1897.

Independientemente de que se hubiera consumado o no el contrato ello no impediría tal defensa. Adviértase que el Art. 1253 se refiere solamente a la *acción* de nulidad y no

al dolo, como defensa. La doctrina en España está dividida([13]) en cuanto a si dicho precepto incluye ambas —la acción y la defensa— o si únicamente trata de aquélla y ésta es imprescriptible. Suscribimos esta última posición por estimarla más correcta y justa. Obsérvese que lo contrario propiciaría la anomalía e injusticia de favorecer a un contratante que incurrió en dolo y mantuvo una conducta pasiva durante cuatro años desde la consumación del contrato para, una vez expirado ese término, entonces iniciar su acción, de modo que la otra parte —sin conocimiento de la existencia del vicio en el consentimiento hasta que es demandado— no pueda levantar el dolo como defensa.

El sexto error señalado por la FDIC es que el tribunal incidió al aplicar a las dos demandas radicadas por el Banco contra los señores Rodas y Acosta la defensa de cosa juzgada. No es menester discutirlo. En el análisis previo del dolo decidimos que esta defensa procedía y era suficiente para desestimar las demandas incoadas por el Banco. Mediante su invocación y aplicación los demandados lograron el mismo propósito que tenían al oponer la de cosa juzgada.

Los señalamientos 7, 8, 9 y 10 han sido discutidos previamente al pasar juicio sobre los planteados de la PRAICO.

---

([13]) A favor de dicha posición están Puig Brutau, *op. cit.*, T. II, Vol. I, págs. 323-324; De Castro, *El Negocio Jurídico*, 1971, pág. 511; Pérez y Alguer, *Comentarios al Tratado de Derecho Civil de Enneccerus*, 2da ed., T. I, Vol. 2, pág. 390. Castán, aunque no asume posición alguna nos señala que en favor de esta dirección está la doctrina en Francia y que la misma es favorecida por la escuela romanista a base del principio de *"quae temporalia sunt ad agendum, perpetua siuet ad excipiendom"*. Castán, *op. cit.*, pág. 578. Además Puig Brutau, *supra*, señala que esta posición también es sustentada por Delgado Echevarría, *La Anulabilidad*, pág. 1036, y por García Goyena, *Concordancias, motivos y comentarios del Código Civil español*, Madrid, 1852 (Reimp. en Barcelona, 1973) T. III, pág. 194.

Por otro lado se oponen a esta doctrina Manresa, *op. cit.*, T. VIII, Vol. 2, pág. 849, y Puig Peña, *op. cit.*, T. I, Vol. II, pág. 698.

El último señalamiento se refiere a la negativa del tribunal a reconocer que existía el derecho de *compensación* a favor del Banco. Aduce que actuó incorrectamente al no aplicar a una deuda de $30,000 que tenía Acosta & Rodas, Inc., el producto de la venta de ciertas casas del proyecto Extensión El Rosario y el balance de una cuenta de ahorros. No tiene razón. La sala sentenciadora reconoció dicho curso de acción, pues al estimar la partida de lucro cesante *dedujo* la deuda que tenía Acosta & Rodas, Inc. con el Banco sin incluir la de $30,000. Por tanto, reconoció que el Banco mediante su operación interna había cancelado esta acreencia al utilizar la cuenta de ahorros y el producto de las ventas.

Por los fundamentos expuestos *se dictará sentencia que modifique la del Tribunal Superior, Sala de Ponce, en los siguientes extremos: (1) declarándose con lugar la demanda de tercero contra el Banco Crédito y Ahorro Ponceño (Banco), ahora Federal Deposit Insurance Corporation (FDIC); (2) reduciéndose la partida adjudicada en concepto de lucro cesante de $82,701.82 a $50,958.11; (3) reduciéndose la partida de $10,000 otorgada a cada uno de los señores Rodas y Acosta por embargo ilegal de sus automóviles personales a $1,000 respectivamente; y (4) resolviéndose que la FDIC responde en sustitución del Banco en su carácter de síndico únicamente hasta el límite de los activos de este último. Así modificada, se confirma.*

El Juez Presidente Señor Trías Monge se inhibió. El Juez Asociado Señor Díaz Cruz no intervino.